Today is another criminal appeal, United States v. McLean. Mr. Mitchell. Thank you, Your Honor. Good morning. May it please the Court. I'd like to thank the Court for having us down here. Two general issues in this case, and I'm sure the Court is aware of the facts. One has to do with a motion to suppress a warrantless arrest, and the other has to do with 404B. I'd like to, if you don't mind me sort of priming the pump, so to speak, with just a brief recitation of the facts, because I think there's no dispute between the parties as to the factual findings made by the judge, and we both agree that they were correct. Pretty generically, an informant was arrested in Baltimore City back in March of 2010. The informant, in exchange for, I think, a release on that case, agreed to put the police officers on with some information about drugs being sold out of a nearby house. He could not identify the house from which the drugs were being sold, but he did say this is the block, it was the 2200 block of Guilford Avenue. He didn't know what, or at least the police, he didn't tell the police what drugs were being sold, nor identify which clique or individuals were involved in the selling of the drugs. Did you say he could not identify the house? He could not, Your Honor. The house? He could not identify the house or the participants or the drug, merely the block. That was enough. The officers went out and established surveillance, and as the government, Mr. Press reports in their brief, they set up surveillance at about 300 feet, or the length of a football field. A hundred yards? A hundred yards. With binoculars? Ten by five or ten by 50 binoculars. Three officers, I think second and third floor. Good distance, but they had a pair of binoculars. But the binoculars brings it up a lot closer. Oh, it does, Your Honor. I think it's a ten to 50 times enhancement. So, obviously if you've ever been to a football game, you know the length of a football field. That means it's like 30 feet. Well, I don't know that I'd go that far, Your Honor. But certainly I would agree that it enhances the vision of the officers on surveillance. But apparently not well enough because there's a lot of stuff that they couldn't see. A gentleman later to be identified as McClain comes through the alley, goes into the back of a house that has a padlock on it, unlocks it with the key, goes in, comes out, leaves, comes back with another gentleman, he sort of loiters in the alley, goes back into the house by himself, comes back out, hands that gentleman a packet. They go up the street a little bit. Officers still keeping their eyes on them. And at this point, to point out, it's important to I— How many houses are there in this area that the informant has identified as a location? It's a block, Your Honor. And if I could defer to counsel on that because he was trial counsel. But they're flats. They're row houses. So I'd venture about 10 per side on a block, which is pretty common to that area of Baltimore. In the period of their surveillance, how many people went in and out of any of these houses? From the back, I think just McClain—I mean, on the record,  Jess McClain went in. But they were in the back alley as opposed to across the street looking at the front of the houses. They all have rear entrances. They were looking at all of these houses. You don't know the number of them. It seems like it would be significant on your question whether or not there's a lawful arrest that if you— because I don't know what the scope of the search is, or at least the surveillance. I guess you could surveil the whole city if you were up in the satellite type. As best I know, Your Honor, it's a pretty big area. And they're far away from it. And it's a sort of standard Baltimore City block. So McClain is the one that goes to one of those houses? Well, yeah, but it is at 7.30, 8 o'clock in the morning. And it is back entrance. And so a lot of people, you suppose, would not be coming out the back of their houses at 8 o'clock in the morning. Also important to point out in response to your question— The statement says that the people were going in the back of the house or was it just a house? I don't recall that he was saying that, Your Honor. I just recall that he points that they're selling drugs out of a vacant house, and the house was vacant. How many vacant houses were on the block? I think more than one, Judge. But honestly, I can't give you a specific number, but more than one. So the thing I want to point out sort of related to that is that the officer says, other than him coming in and out of this house and using a padlock to enter the back of the house, he said nothing was unusual or abnormal about his behavior. He described the police officer at the motions here, described them as— Someone's going 7 o'clock in the morning to a vacant house and taking a padlock on it. That looks a little unusual. Oh, I think it does, Judge. I mean, I hope it's clear from my brief that how I think these facts play out is if I were standing here arguing reasonable suspicion to conduct an investigative stop, I think we'd have a real live debate, and I'd be sweating a little more. But we're not doing that. The government— Clearly probable cause makes it different. I think it does, Your Honor. Clearly probable cause is higher on the spectrum than— Because they went down to the corner and arrested him. They did. They sent him down the street. They did. And they didn't go down—what they normally do is they'll sort of roll up on you and put you up against the wall and pat you down for weapons, and in the course of doing that, presuming that they're following the law, they pat down, they feel something that's immediately apparent contraband, and they pull it out. But they said at the motions hearing, the government doesn't disagree, and the judge did find, and the officers agree, this is a full-blown arrest. They just— They just drove down and arrested him. Drove down and arrested him. Was not a Terry stop. Was not a Terry stop. Put him in handcuffs, told him he was under arrest, and searched in his pockets and retrieved the key to the house. Now, McLean's not challenging the legality of the search of the house itself. It's a vacant house. He doesn't have standing to do that. But I submit, to the extent the court's thinking in this direction— But he had the key to the place in his pocket. He did, Your Honor. You first challenged that. I thought you— That's all—I'm sorry. Go ahead. That's what I'm challenging. And the reason why I think that gets McLean a new trial and that this is not harmless is because that's what ties him to the house in front of the jury, other than the officer—one of the officers saying, and it's only one because only one has binoculars, and the other two officers say, you know, 300 feet away, a football field away. I couldn't tell what was going on. But to be fair and clear, the officer with the binoculars says, I know that's the guy that went into that house, the guy that he arrested because he was— The one with the binoculars. The one with the binoculars, yes, Your Honor. So without the keys—without the key, the key is a critical piece of evidence, and I think the government agrees, that that's all they have to tie McLean to that house because they arrested him down the street. So it's not like they got— The issue is identity. The key issue is identity and puts him at the house. The binoculars—I thought they saw him going to this house. They did. They did, Judge. Or rather, they testified they did. One of them testified that he did. One of the officers at trial testified with my binoculars, and he said, I don't believe that it's McLean that I saw. Is there any evidence about what these binoculars do, how close that makes him? I do— Did anybody explain it? Yeah, there is that, Your Honor. Let me ask you a question sort of about that. I don't mean to skirt it. The government actually put it in its brief here. It was, in fact, about 100 yards, and he had 10 power binoculars or something. What does that make it look like to the fellow that had the binoculars that he's looking through? It makes it to 10 by 50. This is at the government's brief page. 10 by 50. What's that make it look like? I think that means that it enhances it 10 times. You think it means that. That's what I thought it means, but was there any evidence for the jury to decide what that means? I don't think so, Your Honor. Then it's 10 times, and he was 10 yards away. Well, like you said earlier, 30 yards away, if believed by the jury. No, it's 100 yards. I'm sorry, 30 feet away, 10 yards. It's a football field, which is 100 yards. It would be 10 yards away, so you'd have to be here to consultate what it would look like to the fellow with the binoculars. Right. So that's what they have. That's the testimony that they have, what Your Honor just recited with identifying McLean. That's the testimony they had to tie McLean to the house, testimony of one Baltimore City detective with a pair of binoculars. Keys are critical. Keys are in McLean's pocket and open the back door, and inside they find— You're saying they couldn't consider the keys because the arrest was before they got the keys. They got the keys from the arrest. The keys are tainted. Right. Is that right? Right, and I don't raise the— They're the fruits of an illegal arrest. They are, and I don't raise that as to the search of the house itself because of the warrant, plus McLean not asserting an expectation of privacy or an interest in the house. But without the keys, it's the keys that McLean submits are the fruit of an illegal arrest. Now, there is—I mean, one important thing I'd like to point out here is the government wrote a very solid brief. It was a very capable counsel. Neither he nor I have been able to find a case in this circuit that comes anywhere close to comparing these kinds of facts with a probable cause analysis. The dustup is always around reasonable suspicions. Did you represent him in the district court? I did not, Your Honor. You're new to the case. I am, Your Honor. Okay. With these cases that I cited and that the government cited in its brief as well, the fight is around reasonable suspicion. Usually you're challenging the initial detention. You say, well, there wasn't enough suspicion to do that, and then you smell marijuana or the defendant throws contraband that's immediately apparent. He throws cocaine or ditches heroin gel caps. I suppose a fair way of presenting that question is this, Judge. If you're going to make an arrest without a warrant, you have to have probable cause. So imagine submitting to a judge a request for a warrant saying I want to arrest this person for drugs. You cannot tell the judge what the drug is. At no point along this continuum of time, until they got into the house, could they identify what drug this person that they arrested was allegedly dealing. You mean you had to know—the officer needed to know what the drug was? Why couldn't he just conclude that there was a shady drug transaction going on or having taken place? Well, Your Honor, for reasonable, articulable suspicion, I think that's one thing. But could you imagine— Whether it's marijuana or cocaine or heroin, it's all federal crime. It's illegal. Well, I think that's certainly true, but they are separate crimes. I mean they're all under one statute, but they're all separate punishments. But they're all felonies. I mean I'd be—I don't know why I would have to know that it was marijuana or heroin or something. Well, I guess as a practical matter, submitting an affidavit in request of a warrant to arrest or for search and seizure and not being able to identify to the magistrate what drugs you have probable cause to believe are there. Well, I don't think you have to say it. I mean if you possess with intent to distribute a controlled substance or distribute a controlled substance, that's all it has to say. That's what the statute says. Right. But you have to— If you find out what drug it was, that's a bill of particulars. Right, or a two-wit clause. But if you're looking for probable cause to arrest someone, you have to have, under the totality of circumstances, a reasonable basis to believe a crime has been committed, particularized— A controlled substance being distributed. Right. Or having been distributed. But it has to be particularized to the defendant and to the conduct. Well, I thought the officers testified that they saw what appeared to them, based on their knowledge and experience, that there was a passing of a small packet and some currency back. They did that, Your Honor. Okay. They did that. I am, again, making a very clear distinction between— I suppose what I'm saying is what they ought to have done, what they normally do in these cases, is detain the individual or the guys that he handed the packet off to and conduct a further investigation. If the defendant had to do a Terry stop first, they couldn't arrest first. Right. But I don't know what difference would that make. Well, because I think— If they have probable cause, they could claim they have probable cause. That just makes it harder for them, perhaps, in the court proceeding, in this proceeding. Right, and that's what I'm asserting. They've got an enhanced burden because they've taken it on. We say there's probable cause.  And that's what they did quite boldly, Judge. They said this was a full-blown arrest. So if they had the Terry stop information but not the probable cause information, you know, you could win. And that's what I'm shooting for, Your Honor. And I'll sit down unless the court has any questions, and I'll let Mr. Purcell stand. Thank you. Thank you very much. You had some time saved. Thank you. Mr. Purcell. You're not going to give up just yet, are you? I don't have any give-up in me, Judge. Actually, I do, but I didn't bring it with me today. Good morning, Your Honors. My name is John Purcell. I'm an assistant U.S. attorney in Baltimore. I did—I was the prosecutor in this case. And, of course, the counsel didn't have the benefit of being there, so I was not present for the pretrial hearing, the extensive pretrial hearing in which all the officers who were involved in this stop, in this arrest, were present and testified before Judge Blake. Judge Blake's findings—and I must say I didn't really believe that probable cause, that this first issue would be the issue we'd be discussing here today, but I'm happy to do that. What did you think the issue was going to be? I thought, Your Honor, based on the state of things in the Fourth Circuit right now under 404 law, at least as I see it, I thought it would be a discussion about McBride and application to the judge here. He has a 404B issue in his brief, and I don't think we're going to hold him to waiving it just because he didn't get around to it. We ask him a lot of questions. But the findings of Judge Blake in relation to the observations, which are very carefully set out in the government's brief and, more importantly, set out by Judge Blake and her findings are in the joint appendix at page 252. Judge, when in response to one of your questions as to the access to the House, the officers were told by the informant, who was himself involved in drugs, that this house on the 2200 block of Guilford Avenue was being used, and he said that the rear of the house was being accessed. He identified that specific house. He did, and there's a cite to that in the joint appendix, and I can cite to— Actually, I can cite to the pictures of the house that are a part of the joint appendix. Does the informant information have anything to do with this? Of this defendant? No, with this appeal on a probable cause issue. It does, yes, Your Honor, because it was part of—it was the reason why the officers acted as they did to arrest the defendant. Because they went there— That sounds more like—the informant information sounds to me like more like terry-top stuff. Well— I mean, they were where they were, and they saw a felony being committed, they say, and they undertook to arrest somebody. Part of— That's what they say. I mean, that's what the judge found. I couldn't see where the informant information had much to do with it. The only reason I don't disconnect it, and there is no disconnect in it, because it is the informant information that took them to where they were, and it was the basis upon which they concluded, oh, the informant is correct. There are drug deals being—what they thought to be drug deals going on out of the back of this house. As to the house and other access, though, Judge Winn, if I may get to that, there are photographs in the joint appendix at pages 25 and 37. The front of the house was inaccessible. It was completely boarded up. This was an abandoned city-owned home. The back of the home was boarded up, but somebody had hinged the plywood and put a lock on it. The defendant, of course, as the court's already noted, had the key to that. But based on what the informant said, the officers knew when they got to the scene that they were looking for activity. The defendant didn't own this house. No, in fact, he actually—Judge Blake found that he had no standing in the house, and this is, of course, where the bulk—and this is the only drugs that were found in the case. The drugs that were transacted in the alley, those people who bought those from the defendant, they went on their way. They were not stopped. The three-man team— Basically, he had just taken over, at least from your perspective, taken over the house and locked it up. Yes. He used it as his stash house, it looked like. What kind of drugs did you prosecute him for? The drugs that were found in the house were all cocaine, Your Honor, all vials of cocaine. So you didn't prosecute him for the drug transaction in the street? No, there was nothing recovered there. So the one they saw was not what they charged him with? No, there was no evidence recovered because— You charged him with possessing with intent to distribute what you found in the house. After they took the key from him after— It's not his house, according to Judge Blake. He didn't argue standing, and the court found, of course, he had no standing. So those drugs—the defense argument is— He had no standing to complain, but he had the key. He did, yes, and that did not give him standing, however, because it was a city-owned home. Insofar as taking those keys, they would have to have had a full-blown arrest. Your Honor, we're not contesting that it wasn't—that the keys were not— or the keys were not subject to search and arrest, that they were recovered pursuant to that sort of an arrest, yes. We're not arguing—he did not argue then or now the reasonable suspicion. Because it was a more intrusive search than I think Terry would permit, at least as articulated to us by the officers, and there was no sense in arguing something that was a failing argument. And in fact, even though the mind of the—the thinking of the police officers did not determine things, they believed at that point they had probable cause. If this was the man they had just seen do what this foreman was saying they were doing, selling drugs out of the house, the back of the house— The person who was actually seen doing the exchange and the money, what happened there? This was all seen— The officers—there was a three-man team in a house directly across from the rear of what turned out to be 2204 Guilford, which was the house they were watching. Judge Blake found they had an unobstructed, clear view, aid by binoculars, Officer Mazet, that is the officer who made the observations. Only one of them had binoculars. Only one did, but, you know, Judge Blake actually noted because of the testimony of one of the other officers that he was actually—even though he couldn't identify the defendant by any way but clothing, that he saw these transactions and there were no other people in the alley during this interval, which was about an hour. And they get the people who were actually doing the transactions. No, and I'm getting to why they didn't do that, Your Honor. Because it's strange to me. You see someone doing something and it seems like you go to the people who are doing it and not someone you think you saw down the road. No, they did go to the person that they saw doing it, and that was the defendant. They had two different groups of people that could go after them. The one who actually did the transfer that you saw, the street-level. The officer's testimony was at the— Couldn't get to him or what? Or did they make a judgment? They just didn't want to be bothered with this. They felt like that was the big guy going there. Yeah, when they were watching from this hundred yards away, they saw the defendant go into the house very quickly for about 30 seconds. The judge found long enough to retrieve something, come back out, and then go away. Then he came back again with another person, left that person standing in the alley. This is the defendant now. Went into the house, used the key, opened the lock, went in. The drugs were found in the reports. But the defendant did the transaction in the alley. The defendant did the transaction in the alley. The person he delivered the substance to, whatever it was, left town. He was never apprehended. So the police had a choice, and the choice was this— I'm going to make sure I'm clear on that. May I clarify? When the defendant came out of the house, he came with the other person? The other person was already out there. The other person walked with him to the edge of the sort of rear alley. They saw something between the defendant and this other person? They did after the defendant went into the home. He left the man standing in the alley, walked 15 feet to the door, used his key, went in. The drugs were, as it were, found right next to the door. So he grabbed what he grabbed, came out, gave it to the person in the alley. They together walked a little bit away and met two other people who they think were the company. They know that he gave them drugs at that point? Well, the judge credited their experience, the details of what they exchanged. I understand that. They weren't in the best neighborhoods, and people who live in the bad neighborhoods, you're not going to get the benefit of that if that happens. I can live with that. But what I want to know is when he gave this package to this individual, all they knew is they gave him a package. Yes. But what really triggered this is I understood it was when this individual, this package didn't see someone else. He points over, someone else comes over, and they do an exchange, and there's some money or something between this other individual and the person with the exchange. Yes. And what's confusing to me at that point is you see the actual transaction that looks like there's money, which probably gives you a stronger belief this is actually drugs now. People don't just give a package for money for something coming out of a house. Why they couldn't get to them? As I've been trying to clarify, it is that. I don't know if that needs clarification. Either they couldn't get to them or they made a choice. Well, when they – just give me two seconds, and I'll explain exactly what they did. I'm not telling you why they did it, but this is what they said about why they did it. They're 100 yards away. They're on the third floor of an abandoned building. They watch this transaction. They see the defendant give to another person. The defendant signals to those persons to come and get the drugs. Then the defendant goes. He walks up the street and goes away. Those individuals walk up the street and go out of sight. He goes out of sight. And so do the individuals. They're all out of sight. Now the police go from the third floor, get into their car, drive over, and the first person they see on the corner of one block east is the defendant, the person they had recognized, go into the house and make the transaction. Did the two individuals that were involved in the actual so-called transaction, did they go in the same direction as the defendant or they went somewhere else? Well, they went back to the front of the 2200 block of Guilford, but they were not seen again. And the officers were asked if they ever saw them again. They could have gone anywhere once they got onto the front of the block. I guess what I'm asking is if the officers at that point, if there's some basis for arrest, it's got to have occurred by then, and what you have is a defendant that comes out of the house and hands a package to someone, ostensibly waves to someone, but then the actual people involved in the transaction are there, and they come down and they make a decision to go after the person they can't see down the road. I couldn't see any of them. I think you're wondering what happened to the other two people. It seems reasonable that you'd go after the people you just saw, do this transaction. They did. But they didn't see when they went out in the street, the person they saw, and the person they wanted was the person who had used the key to get into the house to bring out the drugs and give them to the people who were buying. I take it you never did get those other two people out. It's never been said anything else that we never got them. They never saw them again. And the officers actually were asked about that at length on cross-examination at trial because it was part of the disclosure of the 404, at trial but at the motions. And they said, listen. The only thing you have tying the defendant to this is that key that's able to open the pad. No, we have him at the door. That could give you the, well, I guess when you're talking probable cause, when you're looking here, because what you've got is you've got a defendant that comes out, you've got a person who comes out dressed up in clothes who looks, I don't know if he looks, I don't know what officer looks. Officer Mays said, I saw him, that's the person. He was very carefully crossed and directed on that. And he said, I didn't just arrest him because of his clothing, for instance. I arrested him because I had just seen him. I've been watching him all this period. That was the man. I had no question about it. And Judge Blake, as she should have, she credited that. But the reason they went after him is, first of all, they saw him first, and he was the person who had access to the house who did the deal. But that's also the person they said they wanted. They were not interested, and nobody's interested, in buying from customers or getting from customers unless they can lead you to the dealer. They didn't need to be led to the dealer because they had the dealer. They just saw him access the stash house, which the CI, of course, had said was exactly what was being done. They arrested the drug dealer. And they said that. We don't go after addicts unless we have to work our way up. We had now the guy we would work our way up to. Was there any evidence about the help that these binoculars gave? Your Honor, I heard your questions, and I just sort of – Let's leave it for the jury to figure that out. Well, this was more at the motions hearing that, in terms of its importance to the issue of probable cause, but neither place did we get into that. Well, wasn't it first to the jury? Didn't you introduce it to the jury? We did, but certainly – You had to convince the jury this was the right fellow. I think the key helped a lot in that respect. Well, I think the key did, but you had to – okay. So it didn't make any difference what the binoculars did. Well, certainly, no, it did because that led to him being the person they stopped. It was either they were just coincidentally, insanely crazy that they just happened to pick out the guy they identified, and he just happens to have a key on him. Well, anybody explain it to Judge Blake, then? No, but more to the point, Your Honor, in the motions hearing, we did not get into the specifics of how much that aids your vision. I think that I assumed everybody sort of had a sense of that, and the witness himself testified. Common sense. Well, the witness himself testified, too, with great clarity as to – what he was able to see in terms of why he picked this person and was very clear it wasn't just because he had on whatever it was, clothing that he described. He said that was the person. I picked him out, and I knew that was the guy. They were really going a lot on their experience and what they kind of perceived to be neighborhoods like this. Well, Your Honor, there's a Fourth Circuit case cited in the government's brief called Johnson, and it applies, I think, here, and it's sort of a common-sense thing, but for police officers like this, this was a sergeant who had been doing this for years, only narcotics. He'd work in Baltimore. Everything's narcotics, no matter what crime you do. They don't take pictures of stuff like that when they're doing it. They always do it on those television shows. That's television, Judge. But, you know, to take a picture is not a hard thing to do. You know, I've had that conversation, and we all have. You can pretty much take your iPhone and take a picture just about as good as anything. They didn't take any pictures or do anything to show the individual who's walking to this house. They got binoculars. Why not just put a camera in your hand as you come to that? Click a picture of them as you're going there, and you can pretty much identify. Yeah. We have to deal with the absence of evidence like that in every trial where the police don't do that. The problem with doing that is it sort of creates a zone in which there are people who live and they have sort of lesser rights than others. Yeah. And you've got an area where you've known drugs and all that kind of thing is going on, and I'm not sure it would fly in a different neighborhood. And it's bothersome not so much in terms of, you know, from the defendant's perspective, but just in terms of what the implications of it. To go in a neighborhood, just take your binoculars, get up high up on the floor when you really don't have access to get down to the person very quickly. There's no one down on the ground there to make the move. To actually have a drug transaction in sight, but you can't get to it. So then you get in your car and you go after the guy you think that you saw based upon his clothes, and you're in a neighborhood where people kind of probably look a lot like them, but based on their experience and stuff, they arrest them. Your Honor, I think Judge Blake, with her many, many years of experience, and that's why we have hearings. That's the problem I've got, is we're dealing too much with years of experience and we're dealing too much with inferences and not enough with facts. And that's kind of where the Fourth Amendment is being divided up when we get to drug cases. It's somewhat bothersome. Because we've got a community, when you get experience and inferences, people live in areas and there are people who are not criminals who live in that area. And yet if somebody had walked to that door innocently, if Grandma had walked up to that door, and let's say Grandma just said, well, I'll just keep some furniture here or keep a small package in here, taken a package and walked out with it, she'd been under surveillance because, I mean, you'd think that she'd had drugs. Someone says there's drugs. You don't know what's in that package. I know that's far-fetched. But nonetheless, the import of experience and what it looked like is very strong in this case, which if you ask me, I agree with you totally. It looks sure, experience feels that way, but shouldn't the Fourth Amendment require a little bit more for probable cause as opposed to reasonable suspicion? Well, they had the information going into it. And I don't think experience means... They could have gotten it had they just waited or done a little bit more work here. It looks like it just took a little bit more, and it's right there in their hands. But why do that? I've got my experience. I know what this is. I'm going to just do it. That's dangerous, isn't it? Well, it can be, and that's why it went through the careful litigation that it did go through. These are all questions that were posed. And Judge Blake didn't testify or she didn't find this based on her experience with previous things. She credited what was seen. And as I said, in the Johnson case, the Fourth Circuit case, there are certain transactions that, as they're done, furtive gestures, cash-changing hands, packages going back and forth in a way that is inconsistent with common everyday life, at least in the minds of the police and the judge who's listening to those police and making credibility findings about them. You don't know if it was, in fact, drugs that was exchanged or not. Well, there was nothing else. Cash exchange, it looked like it was. You didn't stop the people that had it. You didn't even make that – it just looks like that's what it was. And it looked like he went in the house to drugs, and it looked like he had a package, and he looked guilty. And as a result of that, you get probable cause. And what you've got, I mean, it seems like there's another little step here that's missing. Something is missing in this scenario that seems so easy. Go down, get these guys that just did that transaction. Look what they got right there. Most of them are probably going to turn evidence right then against this other guy, maybe. But if they don't. Well, they didn't see them, as I pointed out. They did not see those people again. The buyers were gone, probably using the drugs in some other abandoned house. I don't know, but they were not on the street. So that's an impossibility. You've got to believe he's probably going to come back to this house. He padlocked it. He's going to come back again. Now you've really got something. Why don't you get a little closer this time? Take a few pictures, and you've really got something locked. And guess what? You don't come up to the Fourth Circuit with it. That's not the set of facts that Judge Blake considered when she found that there was. She was limited just like we are to what we are, and that is experience and what it looked like. She was limited in the same way. She could make all the facts she wanted to make, but those facts can be based on no more than what it looks like in experience. Your Honor, the standard for probable cause is just, was it reasonable for those police officers to reach that conclusion? And she concluded, yes, it was. As opposed to a reasonable suspicion, the standard would be? Well, it's certainly a higher standard. What would reasonable suspicion be? Reasonable belief that there's a crime going on. Looks like it meets reasonable suspicion to me. Well, I'm not talking about reasonable suspicion. That's the point. That's what I'm getting at. But you still haven't articulated the difference. What's the difference between reasonable suspicion and probable cause? Well, that's a tough one, because- No, it should be easy, because reasonable suspicion is- They're both measured under the totality of circumstances. It's a totally different thing. But probable cause clearly is something much more elevated. The judge's determination is whether these officers, when they observed what they observed, under the totality of the circumstances, could reasonably conclude that this individual- What is the difference between reasonable suspicion and probable cause? The difference is what you can do and how far you can go with that belief. With the reasonable suspicion- Well, I'm not asking the result of them. I'm asking how do you differentiate between the two when one has occurred as opposed to the other? Reasonable suspicion is reasonable suspicion, as opposed to a reasonable belief that these individuals have committed or are committing a crime. And that is the specific finding that the judge found that these officers had reached. It was reasonable for them to reach that based on her very detailed analysis of the facts. We don't have the other facts that the court would propose that the police officers have done. Perhaps it would have been better if we did. But under the circumstances, based on what they knew from the CI, what they've been told, what was going on there, where it was happening and what was happening, what they saw themselves from a distance on two different occasions, the access of this person to a house for 30 seconds at a time to do nothing but a very brief transaction in the house, to come out, to even leave somebody outside that house was significant because it means the defendant would not allow that person into this more protected place. Come out, do what was a money transaction with the officer opined looked like what he called a pack, which is a pack of drugs, which turns out, of course, it doesn't matter what it turns out to be. It turns out to be exactly what was in the house was packs of vials of cocaine. First of all, your red light came on there. It did five minutes ago, yes, Your Honor. Thank you very much. Everybody gets frisky on the last day of the trial. Appreciate it. Thank you, Your Honor. Mr. Mitchell? Thank you, Your Honor. Just to briefly clear up a couple of things, Judge, there was not, Mr. Purcell, I think, misspoke. The confidential informant did not identify a particular house. He identified a particular block. I think this is at Joint Appendix 106. In response to Your Honor's inquiry about the binoculars, Mr. Purcell's right, I don't think they got into the mechanics or the exact qualities that the binoculars had, but they were insufficient, according to the officer that had the binoculars, they were insufficient for him. What's the difference between reasonable suspicion and probable cause? Reasonable suspicion is what would lead a reasonable person to believe that there was some type of criminal activity afoot. Sounds like this case. Your Honor pointed out people going in and out of the backs of padlocked abandoned houses. Probable cause. 8 o'clock in the morning. Probable cause is a type of information that would lead the same reasonable, prudent person to believe a particular crime was being committed in their presence or had just been committed. And we don't have that here. You don't have the particular crime. Something's fishy, clearly. People don't go in and out of the backs of abandoned buildings at 8 o'clock in the morning, and the packets and the training and experience and so forth. But I think, like you said, and I actually wrote it down before you said it because I wanted to bring this up, they skipped a step. They could have stopped McClain and asked him, maybe he'd have copped to it. Maybe they're allowed to lie to him. Maybe they could have tricked him. They could have stopped the other gentleman. Mr. Purcell points out, and he's right, those three fellows were never seen again. They had the contraband on them. They could have waited. It's a stash house. They could have waited until he's gone back. There's not too much demand. The Fourth Circuit, the Fourth Amendment isn't dead. It's not too much demand that they just investigate a little further to go from the reasonable suspicion that we all probably agree they had to the actual probable cause necessary to curtail this person's freedom to a greed associated with formal arrest. Fourth Circuit's recognized. He was going to. I'm just thinking this thing through. It just seems like there's so many ways this could have been fixed up. I'm wondering. He's going into a house that's owned by the city, so clearly he has no reason to be in this house. They see him going in the house. At that point, when he comes out of the house, could they have said, wait a minute, what are you doing in this city? Oh, sure. Would they have had a basis for an arrest then? I actually, middle of the night last night, woke up, went down to my computer at my house, and got on Westlaw because I was thinking, what if this is trespassing? It isn't. It's a crime in Maryland to trespass on private property posted. This is in the court can look at. I didn't put it in the joint appendix because I didn't think of it until recently. But there's like three or four trespassing statutes in Maryland. They require staying on property after being told to leave. So this doesn't qualify as a crime of trespassing either. So the answer to your question is, yeah, they could have gone down and said, you're not supposed to be here, get out. Or they could have gone down and said, what are you doing here? Or they could have watched more. But it's that difference and that absence of additional fact that I would like the court to really pay attention to, that there's a difference and a distinction, and it's clear, between Terry and probable cause. Terry was a case where, very metaphorical of this, fellas standing out in front of a jewelry store at weird hours with boulders in their jacket, and it just looked suspicious. The challenge in Perry wasn't, no one, the government didn't assert, the state didn't assert that they had the right to arrest those gentlemen at that point. The state asserted and the Supreme Court agreed that the officers had a right to detain them for further investigation. The officers here didn't detain anyone for further investigation. The Fourth Circuit has recognized, the Supreme Court recognized, and I don't think anyone in this courtroom would disagree, that you don't have a diminished expectation of privacy because you live in a bad neighborhood. I do think it's clear, and this is the other thing I want to point out. No one on this record, either at the suppression hearing or at trial, used that old buzz phrase, high drug area. It was reported by the officers as being a dangerous area. But this was not reported as being a high drug trapping area. And then finally, Mr. Purcell brought up Johnson. That was a case where the officers, the guy was in a high drug area. He was doing a lot of hand-to-hand transactions. Guys coming by and he would quote-unquote in the case, it was referred to as hit them off, give them packets. The court said, look, we don't know what else the guy could have been doing. It's not like he was hanging out and talking with these gentlemen. They were coming up and getting something from them, giving them money and walking away. But that was a case in which there was clear articulable suspicion for a Terry detention. They then detained him, and when they were detaining him, he took heroin gel caps, identifiable narcotics out of his pocket and ditched them on the ground. So the defendant abandoned his right in that property, abandoned any expectation of privacy that he had in it, so he was left with only challenging the initial detention, which the court, reasonably so, found to be supported by articulable suspicion. So that's all I got, just the distinction between reasonable suspicion and probable cause, Your Honor. Thank you very much, Mr. Mitchell. We appreciate your help. We know you're a court-appointed counsel, and you've done a good job, and you'd be commended. Thank you very much. Thank you, sir. We're going to come down to Greek Council and then go to the final case.
judges: Robert B. King, James A. Wynn, Jr., Henry F. Floyd